IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

SEP 2 6 2003

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| HOWARD PAUL GUIDRY, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL NO. H-01-CV-4140 |
| | § | |
| DOUGLAS DRETKE, Director, | § | |
| Correctional Institutions Division, Texas | § | |
| Department of Criminal Justice, | § | |
| | § | |
| Respondent. | § | |

## ORDER

Pending before the Court is Howard Paul Guidry's ("Guidry") Petition for Writ of Habeas Corpus. (Instrument No. 6). Both parties have filed summary judgment motions in this case. (Instrument Nos. 30 and 32). On December 13, 2002, this Court held an evidentiary hearing in which the parties presented testimony relating to Guidry's claim that the trial court failed to suppress his involuntary confession. Having considered the testimony from that hearing, in conjunction with the record and the governing law, the Court will provisionally grant Guidry's petition for writ of habeas corpus.

## I.    Background

On August 15, 1996, a grand jury indicted Guidry for the capital murder of Farah Fratta. Tr. Vol. I at 3. The indictment alleged that on November 9, 1994, Howard Paul Guidry murdered Farah Fratta "for remuneration and the promise of remuneration." Tr. Vol. I at 3. The indictment alleged that either the victim's husband (Robert Alan Fratta) or Joseph Andrew Prystash promised to reward Guidry for the murder with a vehicle or with money. Tr. Vol. I at 3.



The trial evidence showed that Farah Fratta's husband hired Joseph Prystash to kill her. Guidry's own confession and hearsay testimony from Prystash's girlfriend established that Guidry agreed to help Prystash kill Fratta for one-thousand dollars. Guidry confessed to being the one who shot the victim. At the conclusion of the guilt/innocence phase of trial, a jury found Guidry guilty of capital murder on March 21, 1997. Tr. Vol. I-A at 393. After a separate punishment phase, the jury answered Texas' special issues in a manner requiring the imposition of a death sentence. Tr. Vol. I-A at 408-09.

Guidry challenged his conviction and sentence on direct review in the Court of Criminal Appeals. In a published opinion, the Court of Criminal Appeals denied Guidry's appeal on December 15, 1999. *Guidry v. State*, 9 S.W.3d 133 (Tex. Crim. App. 1999). The United States Supreme Court denied *certiorari* review. *Guidry v. Texas*, 531 U.S. 837 (2000).

On May 1, 2000, Guidry filed a state application for habeas corpus relief. The trial court entered findings of fact and conclusions of law recommending that habeas relief be denied. State Habeas Record at 121-46. On November 8, 2000, the Court of Criminal Appeals adopted the lower court's recommendation and denied relief. *Ex parte Guidry*, No. 47,417-01 (Tex. Crim. App. Nov. 8, 2000) (unpublished).

Guidry sought the appointment of counsel to prepare and litigate a federal petition for writ of habeas corpus. Guidry filed his petition on November 1, 2001, through appointed counsel. (Instrument No. 6). In his federal petition, Guidry raises the following four grounds for relief:

- The State's use of Guidry's confession violated his right to be free from self-incrimination;

- The admission of incriminatory out-of-court statements violated Guidry's Confrontation Clause rights;

- The State violated Guidry's due process rights by referring to Robert Fratta's death sentence during closing arguments in the punishment phase; and

- The trial court's failure to excuse a juror violated Guidry's right to an impartial jury.

On September 10, 2002, this Court denied Respondent's initial summary judgment motion, finding that factual questions needed to be resolved in this case. (Instrument No. 12). Accordingly, this Court held an evidentiary hearing on December 13, 2002, in which the parties presented testimony relating to Guidry's claim that he involuntarily confessed to killing the victim. Respondent subsequently filed a renewed summary judgment motion (instrument no. 30), to which Guidry has responded and likewise moved for summary judgment (instrument no. 32).

## II.    Legal Standards

This Court's summary judgment review is circumscribed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). *See Proctor v. Cockrell*, 283 F.3d 726, 729-30 (5th Cir. 2002). Under the AEDPA, federal relief cannot be granted unless (a) the factual decisions of the state court are unreasonable in light of the evidence or (b) the determinations of legal issues or mixed questions of law and fact are contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000).

The Supreme Court holds that a state court decision is "contrary to" federal precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 413 (2000); s*ee also Bell*, 535 U.S. at 698; *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002). A state court may unreasonably apply federal law if it "identifies the correct governing legal rule from [the Supreme

3

Court] cases but unreasonably applies it to the particular facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2) "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, ___, 123 S. Ct. 1029, 1041 (2003). A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at ___, 123 S. Ct. at 1036.

## III.   Legal Analysis

As previously noted, Guidry raises four claims. For the reasons that follow below, the Court finds that federal habeas relief is appropriate with respect to Guidry's claims involving his confession and the hearsay testimony presented at trial. The Court will deny Guidry's remaining claims.

### A.   Violation of Guidry's Privilege Against Self-Incrimination

In his petition, Guidry claims that the police took his incriminatory statements in violation of the Fifth Amendment's privilege against self-incrimination. Specifically, Guidry contends that the trial court's failure to suppress his statements violated the principles enshrined in *Edwards v. Arizona*, 451 U.S. 477 (1981). "In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d

4

378 (1981), the Supreme Court held that, once a suspect in custody invokes the Fifth Amendment right to counsel, the police may not interrogate the suspect in the absence of counsel--even if the suspect later attempts to waive that right." *United States v. Avants*, 278 F.3d 510, 514-15 (5th Cir.), *cert. denied*, 536 U.S. 968 (2002); *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (stating that *Edwards* set forth a "prophylactic rule, designed to protect an accused in police custody from being badgered by police officers . . . ."). "Under *Edwards*, any statement made by the suspect in response to police-initiated questioning after an invocation of the right to counsel violates the Fifth Amendment and must be excluded." *Avants*, 278 F.3d at 515. The "'rigid' prophylactic rule [of *Edwards*] embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (citations omitted). Both inquiries involve mixed questions of law and fact. *See Soffar v. Cockrell*, 310 F.3d 588, 592 (5th Cir. 2002); *Gachot v. Stalder*, 298 F.3d 414, 418 (5th Cir. 2002).

### 1.   *Factual background*

In denying Respondent's first summary judgment motion, the Court summarized the factual background of Guidry's claim involving his confession. (Instrument No. 12 at 2-9). The Court incorporates that summary and briefly provides another factual recitation. Guidry challenges statements he made while subject to police interrogation. Guidry first gave the police a statement admitting some complicity in the murder, but which limited his involvement to that of a get-away driver. After subjecting him to a polygraph examination, the police secured a statement wherein

5

Guidry admitted to shooting Farah Fratta for the promise of one-thousand dollars. Finally, the police videotaped Guidry as he walked through the crime scene and described how the murder occurred.

Before trial, Guidry sought to suppress his incriminating statements. On August 28, 1996, the trial court originally held a hearing concerning Guidry's motion to suppress. Tr. Vol. 3 at 8-103. When it became apparent that Guidry's counsel (Sylvia Yarborough and Robert Scott) would need to testify in his behalf, the trial court granted a continuance. Tr. Vol. 5 at 19. After the appointment of new counsel, the trial court held a hearing on February 20, 1997, in which the parties presented evidence relating to Guidry's confession.

The State presented testimony from Ronnie Roberts, Jim Hoffman, and Danny Billingsly, the three Harris County Sheriff Department officers involved in taking Guidry's confession. Each police officer testified that they did not know that an attorney represented Guidry in his aggravated robbery case. Tr. Vol. 7 at 12-13, 77, 99. Roberts later admitted that Guidry told him that he had an attorney, but stated that Guidry never indicated that he wanted to speak with counsel. Tr. Vol. 7 at 31-32.

Guidry testified that the police officers did not read him his rights during the initial stages of the interrogation. Tr. Vol. 7 at 158. Guidry testified that, after Roberts showed him pictures of the victim's corpse, he asked to speak to his attorney who had been appointed for an unrelated charge (Layton Duer). Tr. Vol. 7 at 166. Hoffman told him "no." Tr. Vol. 7 at 167. The two officers then left the room for over an hour. Tr. Vol. 7 at 168. Later, Hoffman returned and told Guidry that the police had obtained a statement from his accomplice, Joseph Prystash. Tr. Vol. 7 at 169. After Guidry read the statement, he "demanded" that the officers let him contact his attorney. Tr. Vol. 7 at 170. Hoffman asked who his attorney was and left the room, saying that he

was going to talk to counsel.  Tr. Vol. 7 at 170-71.  Some time later, Hoffman returned, telling Guidry that he had talked to the attorney.  Hoffman "said it was all right for [Guidry] to answer the questions and don't worry about it."  Tr. Vol. 7 at 171-72.  Guidry decided to cooperate with the police when he heard that his counsel had given him clearance to speak with the police.  Tr. Vol. 7 at 175, 187, 191.

The defense supported Guidry's story with the testimony of the attorneys first appointed to represent him in the capital murder proceedings, Sylvia Yarborough and Robert Scott.  They testified concerning an event that transpired in another state judge's chambers.  On March 15, 1995, the trial court appointed Yarborough and Scott to represent Guidry on the capital murder charge.  Tr. Vol. 7 at 104, 139.  That day, those two attorneys, an Assistant District Attorney, another lawyer and two police officers (including Roberts) were in the judge's chambers.  Tr. Vol. 7 at 105.  One of the police officers indicated that he took Guidry's confession.  Scott then asked Roberts "What do you mean taking Mr. Guidry out, getting in a--getting a confession when you knew he had a lawyer?"  Tr. Vol. 7 at 107.  Roberts told him " I talked to his lawyer, and his lawyer said it was okay to talk to him."  Tr. Vol. 7 at 108, 141-42.  Another attorney present in the room, Deborah Gottlieb, confirmed the details of this conversation.  Tr. Vol. 7 at 131-32.

Duer, Guidry's attorney from the aggravated robbery case, testified that he had never been contacted by the police with respect to the Fratta murder and that he did not give them permission to speak to his client.  Tr. Vol. 7 at 123-24.  This testimony suggested that the police feigned a conversation with counsel in order to trick Guidry into confessing.

After the presentation of testimony, the trial court orally denied Guidry's motion to suppress. Tr. Vol. 7 at 213-14. The trial court stated that the in-chambers conversation only influenced the credibility of the witnesses, not the admissibility of the confession. Tr. Vol. 7 at 212.

At trial, the defense wished to place before the jury the question of whether Guidry invoked his right to counsel. When trial counsel attempted to call Duer as a witness, the trial court questioned whether his testimony would present a question for the jury to decide. Regarding the conversation that occurred in chambers, the trial court stated "I'm perfectly satisfied that the--that the Scott, Gottlieb, Yarborough conversation, while the author of the conversation may very well be up in the air, the substance of the comment is not." Tr. Vol. 24 at 234-35. The trial judge, however, thought that this testimony would be immaterial "unless there is some testimony somewhere from somebody, whether it direct or implicit, or circumstantial, that in fact, the defendant did not waive his rights and, in fact, asserted one or more of them. Unless that occurs, it doesn't make any difference what his lawyers told him." Tr. Vol. 24 at 240. Out of the jury's presence, the trial court then heard substantially the same evidence as presented in the suppression hearing. After considering that testimony, the trial court held that the evidence did not raise a question for the jury to consider regarding the waiver of Guidry's rights. Tr. Vol. 24 at 289-90.

After the conclusion of the trial and the initiation of Guidry's appeal, the trial court issued findings of fact and conclusions of law explaining its decision. Tr. Vol. I-A at 423-29. The trial court extensively reviewed the testimony presented by the State at the suppression hearing. While the trial court discussed Guidry's own testimony, it did not address, much less issue findings of fact concerning, the testimony by the four attorneys. After considering the State's evidence, the trial court found that the police had warned Guidry of his constitutional rights and Guidry had waived

8

those rights. Tr. Vol. I-A at 429. The trial court found that "at no time did [Guidry] state he wanted to have an attorney present prior to or during any questioning; at no time did he indicate he wanted an attorney present to advise him . . . ." Tr. Vol. I-A at 430. The trial court concluded that Guidry had been informed of his rights at least five times and that he intelligently and knowingly waived those rights. Tr. Vol. I-A at 430. On direct review, the Court of Criminal Appeals rejected Guidry's complaint that the taking of his confession violated the Constitution, explicitly deferring to the findings of the trial court. *See Guidry*, 9 S.W.3d at 143.

This Court denied the respondent's original summary judgment motion based on Guidry's renewal of this claim on federal habeas review, finding that factual issues needed to be resolved concerning the voluntariness of Guidry's confession. At a hearing in this Court on December 13, 2002, the parties presented evidence relating to the voluntariness of Guidry's statements. Guidry called five witnesses at that hearing: himself, Layton Duer (his attorney for the unrelated aggravated robbery case), Robert Scott and Sylvia Yarborough (his initial attorneys in his capital murder case), and Debra Gottlieb (the other attorney present during the in-cambers conversation). With some variation from Respondent's witnesses, the testimony in that hearing strayed little from that presented in the various state-court proceedings. The hearing, however, allowed this Court to observe the testimony and demeanor of the witnesses. In the following paragraphs, the Court summarizes its factual findings and observations from that hearing.

Guidry appeared to be a credible witness. Guidry testified that, while in custody for an unrelated crime, his counsel (Layton Duer) advised him not to speak with anyone about his case. (Instrument No. 26 at 16). Guidry testified that, subsequent to receiving that advice, Detectives Jim Hoffman and Ronnie Roberts transported him to another location for questioning about the Fratta

9

murder. The Court finds from his credible testimony that Guidry twice informed the detectives that he had an attorney and would not speak to them outside his counsel's presence. (Instrument No. 26 at 17, 27-28). The Court finds that the police officers then told Guidry that they would contact his attorney and left the room. (Instrument No. 26 at 18, 29). When the police officers returned some time later, Guidry testified that "[t]hey told me that they had contacted my attorney and a deal had been worked out where I could speak to [the police officers] and everything was going to be okay." (Instrument No. 26 at 18). Had this assurance not been made, Guidry testified that he would not have spoken to the police. (Instrument No. 26 at 19, 26).

The testimony of four attorneys (Duer, Scott, Yarborough, and Gottlieb) confirm Guidry's account. While not present at his confession, each of the lawyers provided testimony that enhanced Guidry's credibility. Three attorneys credibly recounted a conversation that occurred in the Honorable Harris County Judge Joe Kegans' chambers. On March 15, 1995, Scott, Yarborough, and Gottlieb overheard two police detectives talk about Guidry's confession. These attorneys testified that they heard the police officers state that Guidry's attorney gave them permission to interview him. (Instrument No. 26 at 38-39, 48-49, 59). When Scott asked Roberts how they were able to secure a confession from Guidry, Roberts said they "talked to Howard Guidry's lawyer. He said it was okay." (Instrument No. 26 at 48). In the evidentiary hearing, Duer (who was not present during the in-chambers episode) testified that the police never contacted him and he never gave the police permission to interview Guidry. (Instrument No. 26 at 12). The Court finds each of the attorneys' testimony to be credible.

Respondent called the three police officers involved in taking Guidry's confession: Ronnie Roberts, Jim Hoffman, and Danny Ray Billingsly. Billingsly supervised Guidry's interrogation and

took part in the videotaped walk-through, but only checked in on the interview "from time to time" and would not have known if the other officers concocted a story about counsel giving Guidry permission to confess. (Instrument No. 26 at 102-03). Each officer testified that Guidry never asked to speak to his counsel. (Instrument No. 26 at 67, 83, 86, 101). Hoffman stated that Guidry never told them that he was already represented by counsel in a separate case. (Instrument No. 26 at 83, 86). Problematically, and in direct contradiction to Hoffman's account (instrument no. 26 at 86), Roberts testified that Guidry told him that he was represented by counsel. (Instrument No. 26 at 66-67, 69, 72).

Roberts, the only police officer specifically identified as being in the state judge's chambers, testified that while he remembered speaking with Guidry's trial counsel in the chambers, Roberts never told Scott or Yarborough that he contacted Duer or that Duer gave Guidry license to confess. (Instrument No. 26 at 67, 71-72, 75). Having observed his demeanor, the Court explicitly finds Roberts' testimony concerning both Guidry's confession and the conversation in the state judge's chambers not to be credible.

In light of the attorneys' testimony, the record, and this Court's own observation of the witnesses' demeanor, this Court finds the police testimony not to be credible with respect to the claim that Guidry never asked to speak to his counsel. This Court finds that the police officers were aware that Guidry was represented by counsel and that they deceived Guidry by telling him that his counsel advised him to speak with them.

### 2.   *Invocation of his right to counsel*

The main point of dispute in this case is Guidry's assertion that he requested to speak to his attorney. Throughout the legal proceedings that have considered the issue, Guidry has maintained

11

that he made that request and the police have maintained that he did not.  On direct review, the Court of Criminal Appeals recognized that "[t]here was conflicting testimony as to whether appellant requested his attorney during the interrogation." *Guidry*, 9 S.W.3d at 142.  The Court of Criminal Appeals accepted the trial court's finding that the police had warned Guidry of his constitutional rights and that Guidry had waived those rights.  Tr. Vol. I-A at 429.  The trial court found that "at no time did [Guidry] state he wanted to have an attorney present prior to or during any questioning; at no time did he indicate he wanted an attorney present to advise him . . . ."  Tr. Vol. I-A at 430. The trial court made no findings with respect to the testimony from Scott, Yarborough, Gottlieb, and Duer.  The trial court seemingly based its findings on a determination that Guidry's account was not as credible as the police officers' testimony.  The trial court concluded that Guidry had been informed of his rights before his first confession and that he intelligently and knowingly waived those rights.  Tr. Vol. I-A at 430.  The Court of Criminal Appeals found "evidence in the record supporting these findings," *Guidry*, 9 S.W.3d at 143, concluding that "[b]ecause the trial court is in the best position to evaluate the credibility of the witnesses and their testimony," the Court of Criminal Appeals deferred to the lower court's findings.  *Id.* at 143.

Respondent argues that this Court must defer to the state court's credibility determinations so long as they are supported by the record.  *See Wainright v. Goode*, 464 U.S. 78, 85 (1983); *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002); *Self v. Collins*, 973 F.2d 1198 (5th Cir. 1992), *cert. denied*, 507 U.S. 996 (1993).  Each of the cases cited by Respondent, however, concerns a district court's inability to reconsider a state court's credibility determination on the basis of the record alone.  Here, this Court's credibility evaluation focuses not on the cold record, but on the same live witnesses, and presumptively the same demeanor, as was presumably considered by the

trial court.  This Court's evaluation of the witnesses' credibility, therefore, extends beyond a mere review of whether the record supports the state-court determination.  This Court's observation and judgment from the federal evidentiary hearing factor heavily into its habeas review and are made more important by virtue of the *limited* credibility analysis provided by the findings of the state court.

This Court understands that the state court's factual determinations must be treated with a great degree of deference.  *See* 28 U.S.C. § 2254(e)(1); *Gachot*, 298 F.3d at 418 ("'. . . the ultimate issue of voluntariness is a legal question requiring independent factual determination, subsidiary factual questions . . . are entitled to the § 2254(d) presumption.'") (quoting *Self*, 973 F.2d at 1204). Although the Court "must apply substantial deference to the findings of fact made by the state court in the course of deciding" the voluntariness of the confession, *Soffar*, 300 F.3d at 592, "deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief."  *Miller-El v. Cockrell*, 537 U.S. 322, ___, 123 S. Ct. 1029, 1041 (2003).  Deference by no means requires this court to ignore its own observations, thus rendering the evidentiary hearing an "exercise in futility."  *Valdez v. Cockrell*, 274 F.3d 941, 952 (5th Cir. 2001), *cert. denied*, ___ U.S. ___, 123 S. Ct. 106 (2002).  The AEDPA preserves the federal court's ability to "disagree with a state court's credibility determination and, when guided by [its standards], conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."  *Miller-El*, 537 U.S. at ___, 123 S. Ct. at 1041.

This Court's review of the record, the witnesses' testimony, and particularly their demeanor, compels the conclusion that Guidry asked to speak with his counsel.  The testimony presented by Guidry in the federal evidentiary hearing, and the inferences stemming from the four attorneys'

13

testimony, constitutes clear and convincing evidence that would rebut any presumption that the police testimony was credible. The police officers, and most particularly Roberts, offered contradictory and changing testimony throughout all the proceedings examining this issue. At times the Roberts acknowledged that he knew that counsel represented Guidry, at other times he professed ignorance to that fact. At times Roberts acknowledged speaking with Scott in the trial judge's chambers, at other times he did not. Further, Roberts provided no satisfactory explanation for his knowledge that Guidry had an attorney, leaving the strong inference that he gained that information when Guidry asked to speak to his counsel. This Court finds that the police officers have not been credible witnesses in this case.

Even though the factual basis for this claim rests on conflicting evidence, independent evidence corroborating Guidry's account establishes the veracity of his claim. The affair in the state judge's chambers strongly bolsters Guidry's credibility and eviscerates Respondent's position. Three attorneys overheard police officers concoct a story which shows they used subterfuge to obtain Guidry's confession. As recognized by the trial court, this conversation strongly influences a determination of the witnesses' credibility. Tr. Vol. 7 at 211-13. Yet the trial court apparently failed to take the inferences flowing from that conversation into account when rendering its decision. The in-chambers conversation presupposes that Guidry asked to speak to counsel. The police would have no reason to tell him that his counsel authorized his confession if he did not ask to speak to counsel. The evidence lends credibility to Guidry's claim that the police tricked him into confessing.

Respondent does not argue that the petitioner made an ambiguous or equivocal request for counsel, only that he did not make that request. *See Davis v. United States*, 512 U.S. 452, 459

(1994) (requiring a defendant to make a request "that can reasonably be construed to be an expression of a desire for the assistance of an attorney"). The Court finds that Guidry has presented clear and convincing evidence that he invoked his right to counsel and that the police ignored that assertion. In light of the evidence presented in state court, the state courts unreasonably determined that Guidry did not invoke his right to counsel. *See Wiggins v. Smith*, __ U.S. __, __, 123 S. Ct. 2527, 2539 (2003) (applying 28 U.S.C. § 2254(d)(2)'s analysis after determining that a petitioner met his burden under 28 U.S.C. § 2254(e)(1) with respect to a mixed question of law and fact). The state courts rendered an unreasonable application of federal law in finding that Guidry did not invoke his right to counsel. *See* 28 U.S.C. § 2254(d)(1).

3.      *Waiver of his right to counsel*

Having found that Guidry invoked his right to counsel, the Court must decide whether he then waived that right. The Supreme Court has established a "bright-line" rule: "[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484. In reviewing whether an accused waived his Fifth Amendment rights in a knowing and voluntary manner, a court must address two questions: (1) was the waiver the product of intimidation, coercion, or deception; and (2) was the waiver made with a full awareness of his constitutional rights? *See Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003). "In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police and it is essential that there

15

be a link between the coercive conduct of the police and the confession of the defendant." *Hopkins*, 325 F.3d at 584 (citing *Colorado v. Connelly*, 479 U.S. 157, 163-165 (1986)).

Here, Guidry asked to speak with his attorney.  Instead of honoring that request, the police officers fabricated a conversation with Guidry's counsel.  While "[n]either mere emotionalism and confusion, nor mere trickery will alone necessarily invalidate a confession," *Self*, 973 F.2d at 1205, the police officers went far beyond any deception that would be tolerable under the Constitution.  Here, the police interfered with Guidry's constitutionally guaranteed right to counsel.

"The purpose of the *Miranda-Edwards* guarantee . . . and hence the purpose of invoking it is to protect . . . the suspect's 'desire to deal with the police only through counsel[.]'" *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (quoting *Edwards*, 451 U.S. at 484).  While Guidry signed a waiver of his rights and received a recitation of his *Miranda* rights in the videotaped walk-through of the crime scene, those events occurred *after* Guidry invoked his right to counsel, and, according to his credible testimony, only *because* Guidry believed counsel had advised him to speak freely with the police.  The police deception caused Guidry to waive his rights under a misapprehension of the full circumstances surrounding that waiver.  The trial court erred in not suppressing Guidry's confession.  The state court's conclusion that Guidry voluntarily confessed does not withstand scrutiny under the AEDPA.  Respondent, nonetheless, argues that error was harmless.

4.    *Harmlessness*

Notwithstanding a petitioner's ability to show that a state court decision is erroneous under 28 U.S.C. § 2254(d), that "does not *require* federal habeas courts to grant relief reflexively." *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003); *see also Horn v. Banks*, 536 U.S. 266, 272 (5th Cir. 2002) (stating that no Supreme Court case "ha[s] suggested that a writ of habeas corpus

16

should automatically issue if a petitioner satisfies the AEDPA standard[.]"); *Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) (finding that 28 U.S.C. § 2254(d) does not entitle a petitioner to habeas relief), *cert. denied*, ___ U.S. ___, 123 S. Ct. 2653 (2003)).   A habeas corpus petitioner meeting his burden under 28 U.S.C. § 2254(d) must still comply with 28 U.S.C. § 2254(a): he must show that "he is in custody in violation of the Constitution or law and treaties of the United States." This includes a showing that any constitutional error at trial "had a 'substantial and injurious effect or influence in determining the jury's verdict.'"   *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)); *see also Aleman*, 320 F.3d at 690 ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome").   Unquestionably, the wrongful introduction of a confession is subject to a harmless-error analysis.   *See Arizona v. Fulminante*, 499 U.S. 279, 310-11 (1991); *Hopkins*, 325 F.3d at 583.   This Court's harmlessness inquiry asks whether evidence independent from his confession sufficiently established Guidry's guilt beyond a reasonable doubt. *See Johnson v. Cain*, 215 F.3d 489, 497 (5th Cir. 2000).

Respondent points to several factors that would suggest Guidry's responsibility for the Fratta murder.   Guidry possessed the murder weapon.   Eyewitness testimony suggested that someone wearing the same color clothes as Guidry did the night of the murder fled from the murder scene in a car similar to Prystash's.   Prystash's girlfriend, Mary Gipp, testified that Prystash agreed to kill the victim for profit.   Her testimony also established that Prystash and Guidry were friends. However, only Guidry's own confession and the hearsay testimony offered by Gipp explained Guidry's precise role in the murder-for-hire scheme.

The trial court's instructions allowed for Guidry's conviction of capital murder if the evidence showed beyond a reasonable doubt that (1) he murdered the victim for the remuneration of either a vehicle or money from either her husband or Prystash or (2) Prystash murdered the victim for remuneration from the husband and Guidry acted as a "party" to the offense. Tr. Vol. I-A at 385-87, Vol. 25 at 20-26. The trial court instructed the jury that "[m]ere presence alone will not constitute one a party to an offense." Tr. Vol. I-A at 385, Vol. 25 at 20. Therefore, under the second basis for conviction, Guidry could only be found guilty of capital murder if "with the intent to promote or assist the commission of the offense, if any, [he] solicited, encouraged, directed, aided, or attempted to aid Joseph Andrew Prystash to commit the offense, if he did." Tr. Vol. I-A at 385-87.

Removing the confession from the evidentiary picture, and Gipp's hearsay testimony for reasons which will be discussed *infra*, the Court finds that the trial evidence did not support a capital-murder conviction beyond a reasonable doubt. The absence of that damning evidence leaves the jury without a basis to determine that either Prystash or Fratta hired Guidry to commit the murder. While the trial evidence showed that someone of the same race and wearing the same clothes as Guidry was present at the murder scene, such evidence alone would be insufficient to show Guidry's complicity as a party to the offense. *See Isham v. Collins*, 905 F.2d 67, 69 (5th Cir. 1990). To support a capital-murder conviction, the evidence must show more than just Guidry's presence at the scene; Guidry must have intentionally or knowingly caused the victim's death. *See* TEX. PENAL CODE § 7.02(a), 19.03(a). The fact that Guidry possessed the murder weapon some time after the murder fails to prove that he formed the requisite intent before the murder to justify a conviction for capital murder. *See Isham*, 905 F.2d at 70. This is especially true as the weapon

18

belonged to Prystash and Gipp saw him, rather than Guidry, with the weapon immediately after the murder. Tr. Vol. 23 at 61, 79-80.

As discussed in the section that follows below, the Court finds that the trial court also erred in allowing the introduction of Gipp's hearsay-laden testimony. Had the trial court properly considered the credibility of the witnesses in the suppression hearing, and had that court prevented the introduction of hearsay testimony, the jury would have been left without a sufficient basis to find Guidry guilty of capital murder for remuneration. Thus, the introduction of Guidry's confession substantially and injuriously influenced the jury's verdict. Respondent's summary judgment motion will be denied on this ground. This Court will grant a provisional writ of habeas corpus on Guidry's claim that the police took his confession in violation of the Constitution.

## B. Introduction of Hearsay Testimony

Guidry argues that the introduction of hearsay testimony at his trial violated his rights under the Confrontation Clause of the Sixth Amendment. Guidry points to six statements made during the testimony of Mary Gipp, Joseph Prystash's girlfriend. Gipp's testimony centered on hearsay statements made by Prystash before and after the murder. Gipp's hearsay-laden testimony contained statements Prystash made against his penal interest alone, as well as ones implicating Guidry in the murder-for-hire scheme. In the latter category, Gipp testified that Prystash told her that he was going to take Guidry to the Fratta house on the night of the murder (Tr. Vol. 23 at 73); he and Guidry had killed Fratta (Tr. Vol. 23 at 83); Guidry shot Fratta in the head as she exited her vehicle (Tr. Vol. 23 at 92); he picked up Guidry after the murder (Tr. Vol. 23 at 92-93); Guidry was to receive $1,000 from the murder (Tr. Vol. 23 at 102-03); and he would pick up Guidry's $1,000 from

Fratta's husband (Tr. Vol. 23 at 85). Trial counsel objected to both categories of hearsay testimony repeatedly, but to no avail.

On direct review, the State conceded that Gipp's testimony contained hearsay. *See Guidry*, 9 S.W.3d at 147. The Court of Criminal Appeals found that Prystash's statements against his own penal interest were admissible under Texas' Rules of Evidence and also did not violate the Confrontation Clause. *See Guidry*, 9 S.W.3d at 149, 150-51. The introduction of those statements is not at issue on federal review. Relevant to the current claim before this Court, the Court of Criminal Appeals held that Prystash's statements against Guidry's interest were not admissible under Texas law. *See id.* at 149. The Court of Criminal Appeals found that it was "doubtful" that those statements possessed any guarantee of trustworthiness to overcome the presumptive unreliability of hearsay testimony. *Id.* at 151. Nonetheless, the Court of Criminal Appeals found that the hearsay statements "did not contribute to [his] conviction or punishment." *Id.* The Court of Criminal Appeals pointed to trial evidence that rendered the effect of the statements harmless: (1) Guidry's confession; (2) Gipp's properly introduced testimony implicating Prystash, and by extension Guidry, in the killing; (3) eyewitness testimony implicating both Guidry and Prystash in the murder; and (4) Guidry's possession of the murder weapon. *Id.* at 151-52. On that basis, the Court of Criminal Appeals found "beyond a reasonable doubt . . . [that the] admission of Prystash's statements regarding [Guidry's] participation in the offense did not contribute to his conviction or punishment." *Id.* at 152.

In this forum, Guidry argues that the introduction of Gipp's hearsay-laden testimony violated his Confrontation Clause rights and that its introduction harmed his defense. The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the

20

right . . . to be confronted with the witnesses against him."  The Confrontation Clause anticipates "'a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.'"  *Ohio v. Roberts*, 448 U.S. 56, 63 (1980) (quoting *Mattox v. United States*, 156 U.S. 237, 242-43 (1895)).  Accordingly, the admission of hearsay evidence violates the Constitution unless "the veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused" such as "when (1) 'the evidence falls within a firmly rooted hearsay exception' or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability."  *Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999) (quoting *Roberts*, 448 U.S. at 66).

Contrary to the holding of the Court of Criminal Appeals, Respondent argues, albeit in a footnote, that Gipp's hearsay testimony implicating Guidry in the murder-for-hire scheme possessed particularized guarantees of trustworthiness that would justify its admission into evidence. (Instrument No. 30 at 35 n. 11).  Respondent argues that Prystash made those statements spontaneously and voluntarily, without the effects of coercion or intoxication, and without minimizing his own complicity in the murders.  It is true that "[w]hen a court can be confident--as in the context of hearsay falling within a firmly rooted exception--that 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility,' the Sixth Amendment's residual 'trustworthiness' test allows the admission of the

declarant's statements." *Lily*, 527 U.S. at 136 (quoting *Idaho v. Wright*, 497 U.S. 805, 820 (1990)). This exception, however, only applies in an "exceptional case." *Lily*, 527 U.S. at 136.

Here, the Court of Criminal Appeals found it "doubtful" that Prystash's statements "possessed 'particularized guarantees of trustworthiness' to overcome the presumption of hearsay unreliability." *Guidry*, 9 S.W.3d at 151. This Court concurs in that judgment. Prystash had every reason to spread the blame for Fratta's death and inculpate others in the murder-for-hire. Importantly, the record gives no particular basis upon which to gauge Prystash's credibility when he made those statements. This Court will not upset the holding of the Court of Criminal Appeals that Gipp's hearsay-laden testimony inculpating Guidry in the murder violated the Confrontation Clause.

The Court of Criminal Appeals found, however, that Gipp's testimony did not contribute to Guidry's conviction or sentence. The support for that court's harmlessness determination was based on two categories of evidence: (1) the additional evidence showing that Guidry killed Fratta; and (2) Guidry's confession that he committed that murder for remuneration. Yet only two pieces of evidence showed that Guidry killed Fratta *for remuneration* or that he acted as a "party" to the murder: his own confession and Prystash's out-of-court statements. The remaining evidence showed his possible presence at the scene and his possession of the murder weapon months after the killing-- evidence insufficient to support a capital-murder conviction when standing alone.

As this Court has already held that the trial court erred in not suppressing Guidry's statements, the hearsay testimony served as an indispensable piece of evidence to convict Guidry of capital murder. Simply put, Gipp's testimony had both a substantial and an injurious effect in determining the jury's verdict. *See Brecht*, 507 U.S. at 637. In conjunction with Guidry's Fifth

Amendment claim, this claim merits federal habeas relief. Respondent's summary judgment motion will be denied on this ground.

### C.     Prosecutorial Misconduct in Referring to Robert Fratta's Death Sentence

Prior to Guidry's trial, both Robert Fratta and Joseph Prystash received death sentences for their involvement in Farah Fratta's murder. Guidry claims that the State violated his due process rights during punishment phase closing arguments by referring to the fact that Robert Fratta had already been sentenced to die. The Court reviews the state court's rejection of this claim under 28 U.S.C. § 2254(d)(1).

The defense focused its closing argument, in part, on convincing the jury that a forty-year period before parole eligibility would be a sufficient punishment. Tr. Vol. 27 at 74-80. The defense pointed out that, if given a life sentence, Guidry could not be paroled until he was at least sixty-years old. While explaining that Farah Fratta's parents now cared for her three children, the State argued as follows:

| | |
|---|---|
| The State: | Now, [Farah Fratta's parents] are 60 now. They are over 60 now. And the argument is that that poor boy [Guidry] will be 60 if he gets life. They're 60 now and what are they doing now? What are they doing now? After they've retired, after they've paid all those years like you and I have, what are they doing now? They're raising three kids like they are brand new newly weds. They are raising three kids. There is no mother. *The father is on death row.* They are raising three children. |
| Defense Counsel: | Your, Honor, we object to that. That's outside the record. We had that issue before and he knew he wasn't supposed to bring that up. |
| The Court: | The Jury heard the testimony of witnesses that were presented. What the lawyers say is not evidence. *The Jury will be governed by the testimony you remember having heard.* |
| Defense Counsel: | Judge, may I have a ruling on my objection? |

| | |
|---|---|
| The Court: | That's the ruling, sir. |
| Defense Counsel: | Your Honor– |
| The Court: | *What the lawyers say is not evidence.* |
| Defense counsel: | Is my objection overruled or– |
| The Court: | No, sir, it's not overruled. |
| Defense Counsel: | --sustained?  Well, then, Your Honor, we ask for an instruction that this Jury be instructed to disregard [the State's] last comments. |
| The Court: | *Ladies and gentlemen, disregard any comments that were not raised by the evidence.* |
| Defense counsel: | Your Honor, we move for a mistrial. |
| The Court: | That's denied. |

Tr. Vol. 27 at 99-101 (emphasis added).

After sentencing, the trial court denied a motion for new trial based on the State's comments. *See* Statement of Facts, Motion for New Trial at 41.  On direct review, Guidry contended that the State improperly exceeded the permissible scope of closing argument by intentionally commenting on Robert Fratta's death sentence.  Guidry insisted that this statement allowed the jurors to abdicate their responsibility to consider the evidence alone, allowing them to impose a death sentence solely because Robert Fratta sat on death row.  In essence, Guidry argued that the prosecution's statement violated the reliability of the sentencing process as in *Caldwell v. Mississippi*, 472 U.S. 320 (1985): the comments "presented an intolerable danger that the jury will in fact choose to minimize the importance of its role . . . ." Guidry emphasized that in jury selection several jurors opined that those defendants engaged in criminal conduct together should be punished equally.

24

The Court of Criminal Appeals rejected Guidry's claim, finding that the trial court instructed the jury to disregard the State's comment.  Specifically, the Court of Criminal Appeals held that "[e]ven assuming there is no evidence in the record that mentions the co-defendant's case and/or sentence, the instruction given to the jury to disregard the prosecutor's statement was prompt and sufficient to cure the error." *Guidry*, 9 S.W.3d at 154.

Guidry renews this claim in his federal petition.  A federal habeas court's review of prosecutorial misconduct claims is "'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  Accordingly, "'[a] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.  The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'" *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002) (quoting *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989)), *cert. denied*, __ U.S. __, 123 S. Ct. 2572 (2003); *see also Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001) ("Prosecutorial misconduct is not a ground for relief unless it casts serious doubt upon the correctness of the jury's verdict."*), cert. denied*, 534 U.S. 1163 (2002); *Ortega v. McCotter*, 808 F.2d 406, 408 (5th Cir. 1987) ("'A prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases.'").  This Court's focus is on "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotations and citations omitted).

Under Texas law, closing arguments must be based on trial evidence, the logical assumptions flowing from that evidence, a response to defense argumentation, or a plea for law enforcement.  *See*

*Wilson v. State*, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999).  In its decision, the Court of Criminal Appeals assumed that the State argued outside of the trial evidence in commenting on Robert Fratta's death sentence.  Neither party has demonstrated that the State offered permissible argument.  However, the impropriety of the State's argument does not alone require federal habeas relief.  The Court of Criminal Appeals rejected Guidry's prosecutorial misconduct claims based on the efficacy of the trial court's curative instruction.  Courts presume that juries follow their instructions.  *See Zafiro v. United States*, 506 U.S. 534, 539-40 (1993) ("'[J]uries are presumed to follow their instructions.'"); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant.").  This presumption exists "unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the prosecutorial misconduct] is devastating." *United States v. Tomblin*, 46 F.3d 1369, 1390 (5th Cir. 1995) (internal quotation marks and citation omitted); *see also United States v. Wyly*, 193 F.3d 289, 299 (5th Cir. 1999).

In this case, the trial court swiftly and effectively informed the jury to disregard any statement unsupported by trial evidence.  Nothing would suggest that the State's improper argument rendered Guidry's trial fundamentally unfair.  The State presented considerable evidence that would demonstrate Guidry's future danger to society.  The trial court properly instructed the jury to consider Guidry's individual mitigating evidence.  While the State referred to Robert Fratta's death sentence, it only briefly mentioned that fact and did not argue that Guidry's punishment should rest

on his co-conspirators' sentences.  There is no indication that the jury could not follow the trial court's admonition.

Considering the State's improper comment in the context of the whole proceedings, the Court finds that Guidry's "trial was not perfect--few are--but neither was it fundamentally unfair." *Darden*, 477 U.S. at 183 (quotation omitted).  The state court could reasonably conclude that the challenged comment did not result in a fundamentally unfair trial.  Guidry has not demonstrated that the state court's determination was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  Summary judgment in Respondent's favor is appropriate on this claim and will be granted.

### D.  Denial of an Impartial Jury Due to the Seating of a Juror Who Could Not Consider Age as a Mitigating Factor

Guidry claims that the trial court's failure to excuse juror Audrey Helton for cause violated his Sixth Amendment right to an impartial jury.  Guidry argues that the Constitution requires a trial court to remove for cause any juror who cannot consider a specific type of mitigating evidence, such as a defendant's youth at the time of the crime.  Guidry contends that Ms. Helton's refusal to consider the mitigating effect of his youth impaired her ability to serve as an impartial juror.

During voir dire, the State explained to Ms. Helton that, if Guidry received a life sentence, he would be ineligible for parole for forty years.  Tr. Vol. XIX at 93-94.  After explaining the parole implications of a life sentence, the State engaged her in the following colloquy:

| | |
|---|---|
| The State: | How do you feel about age being a factor to be considered in this issue No. 2? |
| Ms. Helton: | I don't consider that a factor. |
| The State: | Okay.  Now, listen to what you just said.  Remember that they key word up there in No. 2: Do you find that taking into consideration. |

27

Consider means that you sit here right now with an open mind to consider whatever the evidence might be,  And you just told me: I don't consider age a factor.  You gave me a blanket statement.  I do not consider age.  What if you had a defendant who was 99 years old?  What if you had somebody with a terminal illness?  I mean, just to say I'm never going to consider age, that means that you're closing your mind off to whatever the evidence might be when the trial starts.  You see where I'm coming from?

Ms. Helton:      No.  I can tell you where I'm coming from.

The State:       Okay.

Ms. Helton:      If it's a crime and we find him guilty--or she--he, whomever.  And the only choices we have are these choices and 40 years is the death-- the life sentence, it would not matter to me if he were 99 years old or he were 20 years old.

The State:       Okay.

Ms. Helton:      If that were the penalty, and that was the only choice that we had, you'd have to reach that decision or not reach that decision.

The State:       Based on–

Ms. Helton:      I wouldn't on the evidence that--that's presented in Court.

The State:       Okay.  So, you're thinking there is other evidence that you're going to hear to help you decide what the right answer should be?

Ms. Helton:      No.  I'm going from the fact--maybe I've misconstrued the question.  I construed the question to be if we find a defendant--on the second question we're debating whether life sentence or a death penalty.  Well, in those two cases, from what you're telling me, it would be 40 years or the death penalty.

The State:       Keep going.

Ms. Helton:      Then I would, it would not matter to me how old that defendant was.

The State:       Okay.

Ms. Helton:      In making that decision we considered all the evidence that was presented.

28

Tr. Vol. XIX at 94-96.

During the defense's questioning, Ms. Helton continued to display an inability to accord

evidence of Guidry's youth any mitigating weight:

| Defense Counsel: | And are you willing to give [mitigating evidence] fair consideration under Special Issue No. 2? |
|---|---|
| Ms. Helton: | Yes, ma'am. |
| Defense Counsel: | No, I know you mentioned it and I guess I need you to explain it a little bit further for me because there was a lot of conversation regarding the closure and the 40 year life definition for you. You mentioned that youth--and I think it was discussed in terms of age. And I'm literally hitting on youth now as opposed to age being a factor of consideration. Okay. Not whether or not it will make a true difference to you in the end once you review all the evidence. But can you consider that as a factor under Special Issue No. 2? |
| Ms. Helton: | No, ma'am. |
| Defense Counsel: | You cannot ever? |
| Ms. Helton: | I can't say ever. But as I said before, if a person's convicted or proven to me beyond a reasonable doubt that he is guilty and we were given two options, then his age would not have a factor in my decision. |
| Defense Counsel: | Okay. |
| Ms. Helton: | And in this case, as I'm talking, it's 40 years as opposed to life if we've gotten to that point. And I would not consider a defendant's age in making that decision. |

Tr. Vol. XIX at 119-20.  Defense counsel then asked Ms. Helton if she could envision any

circumstances that would militate against the imposition of a death sentence.  Tr. Vol. XIX at 121.

Ms. Helton responded that, while she did not consider family circumstances or drug usage to be

mitigating, some circumstances would make her consider a life sentence.  Tr. Vol. XIX at 122.

Defense counsel challenged Ms. Helton for cause because she "stated that age or youth could never

be a relevant mitigating factor for consideration under Special Issue No. 2 because of her newly learned information about what life really means and there is a possibility for parole." Tr. Vol. XIX at 125-26. The trial court denied the challenge for cause. Tr. Vol. XIX at 126.

After the voir dire of all potential jurors, the parties used their peremptory challenges. The defense had already expended all of its peremptory challenges before considering Ms. Helton. Trial counsel sought an additional peremptory challenge to use on Ms. Helton, but the trial court denied that request. Tr. Vol. XXI at 25-26. Ms. Helton served as a juror in this case.

On state habeas review Guidry argued that Ms. Helton's inability to consider age as a mitigating factor made her challengeable for cause. The state habeas court concluded that youth is not a mitigating circumstance as a matter of law, and, therefore, "[a] juror is not challengeable for cause for refusing to consider the age of a defendant when determining future dangerousness." State Habeas Record at 144-45 ¶¶ 8-9. Additionally, the state habeas court found that the trial court properly denied the challenge for cause as Ms. Helton was "willing to listen to the evidence, base her decisions upon the law and the evidence, and be willing to consider a life sentence in *some* circumstances." State Habeas Record at 145 ¶ 10 (emphasis added).

Guidry renews his claim in this forum. The exclusion of potential jurors is a question of fact. *See McCoy v. Lynaugh*, 874 F.2d 954, 960 (5th Cir. 1989); *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). "A state trial court's refusal of a petitioner's challenge for cause is a factual finding entitled to a presumption of correctness." *Miniel v. Cockrell*, 339 F.3d 331, 338-39 (5th Cir. 2003); *see also* 28 U.S.C. § 2254(e)(1). Juror Helton demonstrated a general willingness to consider mitigating evidence, as reflected in the state habeas court's factual findings. While the state habeas court's factual findings must be respected on federal review, the Court must decide the underlying legal

question of whether a juror who refuses to consider specific mitigating evidence may serve in a capital trial. The state court's treatment of this legal question is reviewed under 28 U.S.C. § 2254(d)(1).

The Sixth Amendment of the Constitution guarantees that a criminal defendant will be tried by a jury comprised of impartial individuals. *See* U.S. CONST. amend. VI. United States Supreme Court precedent ensures the impartiality of any capital sentencing jury in state court through both the Sixth and Fourteenth Amendments. *See Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Wainwright v. Witt*, 469 U.S. 412, 423 (1985); *Adams v. Texas*, 448 U.S. 38, 40 (1980); *Witherspoon v. Illinois*, 391 U.S. 510, 518 (1968). In *Wainwright v. Witt*, the Supreme Court clarified the "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment[:] . . . whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45). Based on the Constitution's guarantee of an impartial jury, a trial court's failure to remove a partial juror for cause results in a constitutional violation. *See Ross*, 487 U.S. at 85. Guidry claims that a potential juror's refusal to consider a defendant's age as a mitigating factor impairs that juror's ability to serve.

Significant Supreme Court authority emphasizes the importance of a sentencer's ability to evaluate mitigating evidence. "To provide the individualized sentencing determination required by the Eighth Amendment . . . the sentencer must be allowed to consider mitigating evidence." *Penry v. Lynaugh*, 492 U.S. 302, 316 (1989). Indeed, "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally

indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion).  The Supreme Court has concluded "that the Eighth and Fourteenth Amendments require that [a capital] sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis fore a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982).  While a trial judge, and reviewing courts, "may determine the weight to be given relevant mitigating evidence," they "may not give it no weight by excluding such evidence from their consideration." *Id.* at 114-15.

Guidry argues that *Morgan v. Illinois*, 504 U.S. 719 (1992), required the dismissal of Ms. Helton.  In *Morgan*, the trial court denied the defendant's request to question potential jurors if they would automatically impose a death sentence after finding the defendant guilty.  After reviewing the case law pertaining to the qualification of capital jurors and highlighting the constitutional importance of mitigating evidence in the punishment phase, the Supreme Court recognized that any juror that would automatically vote to impose a death sentence shows a refusal to consider mitigating evidence.  *See id.* at 738.  Accordingly, "[a]ny juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Id.* at 739.  The Supreme Court opined that "such jurors obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty: They not only refuse to give such evidence any weight but are also

plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 737. This attitude limits the jury's ability to follow the state capital punishment procedure and obey his oath. *See id.* at 738.

Here, Ms. Helton did not state that she would automatically deliver a death sentence, universally refusing to consider mitigating evidence. Instead, she appeared willing to consider mitigating evidence in general, but would not accord a specific type of evidence (age) any mitigating effect. Citing Texas precedent, the state habeas court held that "[a] juror is not challengeable for cause for refusing to consider the age of a defendant when determining future dangerousness." State Habeas Record at 144 ¶ 9. This statement accurately reflects Texas law. The Court of Criminal Appeals has held that "[i]t is not error for a trial court to overrule a challenge for cause where it is shown that a juror will not or may not give *a particular variety* of mitigating evidence any consideration." *Banda v. State*, 890 S.W.2d 42, 54 (Tex. Crim. App. 1994) (emphasis added), *cert. denied*, 515 U.S. 1105 (1995). The Texas courts hold that Supreme Court precedent does not require that "a prospective juror must give any amount of weight to any particular fact that might be offered in mitigation of punishment . . . ." *Cordova v. State*, 733 S.W.2d 175, 189 (Tex. Crim. App. 1987), *cert. denied*, 487 U.S. 1240 (1988). Therefore, "[t]he amount of weight that the fact-finder might give any particular piece of mitigating evidence is left to 'the range of judgment and discretion exercised by each juror.'" *Id.* at 189 (quoting *Adams*, 448 U.S. at 46); *see also Cuevas v. State*, 742 S.W.2d 331, 346 (Tex. Crim. App. 1987), *cert. denied*, 485 U.S. 1015 (1988). The Court of Criminal Appeals has repeatedly held that "[t]he mere fact that a prospective juror, during voir dire, acknowledges that in their mind such evidence deserves little or no weight, does not create a sustainable challenge for cause . . . ." *Johnson v. State*, 773 S.W.2d 322, 331 (Tex. Crim. App.

33

1989), *aff'd on different grounds sub nom.*, *Johnson v. Texas*, 506 U.S. 1090 (1993); *see also Johnson v. State*, 68 S.W.3d 644, 656 (Tex. Crim. App. 2002); *Prystash v. State*, 3 S.W.3d 522, 526 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000); *Soria v. State*, 933 S.W.2d 46, 65-66 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1253 (1997).

Texas' application of *Morgan* and its underlying principles to this and similar cases comes before the Court in the limited context of habeas review. Ultimately, this Court's focus under 28 U.S.C. § 2254(d)(1) is not whether a constitutional defect tainted Guidry's trial and conviction. Rather, this Court's limited review of the legal question asks only whether the Texas determination was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

Guidry's claim finds support in Justice Scalia's dissenting opinion in *Morgan*. There, the three dissenting justices noted that "[t]he fact that the jury has the discretion to deem evidence to be mitigating cannot establish that there is an obligation to do so. Indeed, it is impossible in principle to distinguish between a juror who does not believe that *any* factor can be mitigating from one who believes that a particular factor . . . is not mitigating." *Morgan*, 504 U.S. at 743 n.3 (Scalia, J., dissenting). Parenthetically, the dissent then adds the following: "Presumably, under today's decision a juror who thinks 'bad childhood' is never mitigating must also be excluded." *Id.* The dissent's reading of the *Morgan* decision supports Guidry's interpretation of its scope. However, a majority of the Supreme Court has not adopted the dissent's interpretation of the *Morgan* decision.

The Fifth Circuit has not directly ruled on the instant issue. In *Soria v. Johnson*, 207 F.3d 232, 245 (5th Cir. 2000), the Fifth Circuit considered a petitioner's claim that a potential juror refused to consider youth as a mitigating circumstance. In reviewing that claim, the Fifth Circuit stated "because the voir dire examination of [the potential juror] indicates that he could not consider

34

a defendant's youth in mitigation of the death penalty, it appears that [his] views were such that he should have been excluded for cause." *Id.* at 245 (citing *Eddings*, but not relying on *Morgan*).  The Fifth Circuit emphasized the portion of the *Eddings* decision that stated that "a sentencer may not 'refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Id.*  In *Soria*, however, the Fifth Circuit did not ultimately decide the issue because the petitioner had removed the objectionable juror with a peremptory challenge.  Respondent, therefore, attempts to distinguish *Soria* based on its discussion of the issue in *dicta*.  Further, Respondent argues that the AEDPA review should focus on Supreme Court precedent, not the Fifth Circuit's interpretation of that precedent.  (Instrument # 9 at 20 n.10).

As a practical matter, this Court is governed by Fifth Circuit precedent and its interpretation of federal law.  The question before the Court on habeas review, however, does not focus on the weight of authority accorded Fifth Circuit *dicta*; rather, the Court must evaluate the state court's application of Supreme Court precedent.  *See* 28 U.S.C. § 2254(d)(1).

While *Soria* based its *dicta* on the *Eddings* case, that case does not govern the issue before the Court.  *Eddings* "relate[s] to restrictions on 'input,' not the subsequent deliberation process." *McKoy v. North Carolina*, 494 U.S. 433, 447 (1990) (Blackmun, J., concurring).  *Eddings* focuses on whether there exists a "legal impediment to the consideration of evidence," rather than a factual question about what weight, if any at all, to accord mitigating evidence.  *Id.*  It is far different to say that the government cannot *prevent* the consideration of mitigating evidence than to say that a jury *must consider* a particular circumstance to be of a mitigating character.  While *Eddings* protects a defendant's ability to present mitigating evidence, it by no means requires the jury to afford that

35

evidence any specific measure of weight. The Fifth Circuit's reliance on *Eddings* in the *Soria* case does not require this Court to afford habeas relief here.

The Supreme Court in *Morgan* required that a juror not be disposed to impose the death penalty automatically; a juror must be able to consider mitigating factors generally. The Supreme Court has not interpreted its *Morgan* decision in a way requiring jurors to give mitigating effect to a particular type of mitigating evidence. Lower federal courts have given *Morgan* a narrow reading. Elsewhere, the Fifth Circuit has held that *Morgan* only "'involves the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant.'" *Trevino v. Johnson*, 168 F.3d 173, 182 (5th Cir.) (citing *United States v. Greer*, 968 F.2d 433, 437 n.7 (5th Cir. 1992)), *cert. denied*, 527 U.S. 1056 (1999); *see also United States v. Hall*, 152 F.3d 381, 410 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117 (1999); *United State v. Chandler*, 996 F.2d 1073, 1103 (11th Cir. 1993). Federal courts have held that *Morgan* does not require a trial court to question potential jurors how they would vote if presented specific mitigating evidence. *See United States v. McVeigh*, 153 F.3d 1166, 1208 (10th Cir.), *cert. denied*, 526 U.S. 1007 (1998); *Sellers v. Ward*, 135 F.3d 1333, 1340-42 (10th Cir.), *cert. denied*, 525 U.S. 1024 (1998).

While Guidry's claim finds some support in both *dicta* and dissenting opinion, federal habeas review requires him to show that the state determination was an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *Morgan* does not explicitly hold that jurors must consider specific types of mitigating evidence, only that they not automatically dismiss all mitigating evidence in their punishment-phase decision. Federal courts limit *Morgan* to its explicit holding. While *de novo* review of this claim

36

might persuade the Court that the Constitution requires jurors to be able at least to consider each variety of mitigating evidence, clearly established federal law does not dictate such a result on habeas review.  Under the Court's limited habeas review, the Court cannot say that the Texas' approach to an individual consideration of mitigating evidence is contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

The state court found that Ms. Helton would be an impartial juror.  Based on the discussion above, the governing precedent, and the record, that was not an unreasonable determination.  *See* 28 U.S.C. § 2254(d)(2).  The Court will grant Respondent's summary judgment motion with respect to this claim.

## IV.   Certificate of Appeallability

Although Guidry has not yet requested a Certificate of Appeallability ("COA") on the two claims denied in this Order, the issue of a COA is likely to arise.  This Court may deny a COA *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  The Supreme Court has explained the standard for evaluating the issuance of a COA as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds.  We hold as follows:  When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El*, 537 U.S. at __, 123 S. Ct. at 1039-40.

The Court has carefully considered each of Guidry's claims. While the claims denied by this Court deserve close scrutiny, the Court finds that each of them is foreclosed by clear, binding precedent. Under the appropriate standards, this Court concludes that Guidry has failed to make a "substantial showing of the denial of a constitutional right" with respect to each issue denied by this Court. 28 U.S.C. § 2253(c)(2). This Court concludes that Guidry is not entitled to a COA.

## V.   Conclusion

For the foregoing reasons, the Court **ORDERS** the following:

1.   Petitioner Howard Paul Guidry's Petition for Writ of Habeas Corpus (Instrument No. 6) is provisionally **GRANTED** with respect to his claims involving his confession and the hearsay testimony given at trial. Respondent's summary judgment motion on those grounds is **DENIED**.

2.   Respondent Janie Cockrell, Director, Texas Department of Criminal Justice, Institutional Division, shall release Petitioner Howard Paul Guidry from custody unless within 180 days the State of Texas conducts a new trial. The 180-day time period shall not commence until the conclusion of any appeal from the portion of this Order that denies federal habeas relief, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.

3.   Respondent Janie Cockrell's Motion for Summary Judgment (Instrument No. 30) is **GRANTED** with respect to all other claims.

4    With the exception of the aforementioned issues, Petitioner Howard Paul Guidry's Petition for Writ of Habeas Corpus is **DENIED**. His Motion for Summary Judgment on those grounds is likewise **DENIED**.

5.   A Certificate of Appealability is **DENIED** with respect to the claims rejected by this Court.

Signed at Houston, Texas, on _September 25_, 2003.

_____
VANESSA D. GILMORE
UNITED STATES DISTRICT JUDGE